ANHEUSER–BUSCH, INC.,
Plaintiff–Appellant,

v.

BALDUCCI PUBLICATIONS; Richard
Balducci; Kathleen Balducci,
Defendants–Appellees.

No. 93–2196.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1993.

Decided June 30, 1994.

Richard Lehv, New York City, argued (Norman S. London and Thomas J. Cotter, St. Louis, MO, on the brief), for appellant.

James E. Parrot, St. Louis, MO, argued (Richard E. Schwartz, on the brief), for appellee.

Before McMILLIAN, Circuit Judge, JOHN R. GIBSON *, Senior Circuit Judge, and BOWMAN, Circuit Judge.

JOHN R. GIBSON, Senior Circuit Judge.

Anheuser–Busch, Inc., appeals from the judgment of the district court dismissing its federal and state trademark infringement, trademark dilution, and unfair competition claims against Balducci Publications and its publishers, Richard and Kathleen Balducci, for the use of registered Anheuser–Busch trademarks in a fictitious advertisement for "Michelob Oily." *See* 15 U.S.C. §§ 1114(1), 1125(a) (1988); Mo.Rev.Stat. §§ 417.056, 417.061 (1986). We have carefully reviewed the record before us, and we reverse.

Anheuser–Busch operates a brewery in St. Louis. Its products include the Michelob family of beers: Michelob, Michelob Dry,

---

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

Michelob Light and Michelob Classic Dark. For use in its marketing of these products, Anheuser–Busch owns several federally-registered trademarks: (1) Michelob; (2) Michelob Dry; (3) A & Eagle Design; (4) Bottle and Label Configuration; (5) Bottle Configuration; (6) Vertical Stripe Design; (7) the phrase "ONE TASTE AND YOU'LL DRINK IT DRY;" and (8) Vertical Stripe and A & Eagle Design. Of these, (1) and (3) are also registered Missouri trademarks.

Balducci Publications is a publishing business owned by Richard and Kathleen Balducci, also defendants in this case. Balducci Publications has published *Snicker*, a humor magazine, since April 1987. The back cover of issue 5½, published in April 1989, contains a mock advertisement for the fictitious product "Michelob Oily." A reduced copy of the advertisement is attached as Appendix A. The advertisement states in bold type, "ONE TASTE AND YOU'LL DRINK IT OILY" immediately above "MICHELOB OILY®." The accompanying graphics include a partially-obscured can of Michelob Dry pouring oil onto a fish, an oil-soaked rendition of the A & Eagle design (with the eagle exclaiming "Yuck!") below a Shell Oil symbol, and various "Michelob Oily" products bearing a striking resemblance to appellants' Michelob family. This resemblance was quite intentional, as evidenced by the admitted use of actual Anheuser–Busch "clip-art" [1] in replicating several of the protected trademarks. In smaller text the ad opines, "At the rate it's being dumped into our oceans, lakes and rivers, you'll drink it oily sooner or later, anyway." Finally, the following disclaimer is found in extremely small text running vertically along the right side of the page: "Snicker Magazine Editorial by Rich Balducci. Art by Eugene Ruble. Thank goodness someone still cares about quality (of life)." A full-size reproduction of this part of the ad is contained in Appendix B.

Balducci continues to sell back issues of *Snicker*—including Issue 5½. Advertising for back issues of the magazine has included the words "Michelob Oily" and a blue ribbon design associated with Anheuser–Busch.

Mr. Balducci stated at trial that he used the parody to comment on: (1) the effects of environmental pollution, including a specific reference to the then-recent Shell oil spill in the Gasconade River—a source of Anheuser–Busch's water supply; (2) Anheuser–Busch's subsequent decision to temporarily close its St. Louis brewery; and (3) the proliferation of Anheuser–Busch beer brands and advertisements. The defendants concede they possessed no knowledge that any Anheuser–Busch product actually contained oil.

Anheuser–Busch, displeased with Balducci's extensive use of its trademarks and the possible implication that its products were tainted with oil, brought this suit in May 1989. It asserted five causes of action: (1) infringement of federally-registered trademarks, 15 U.S.C. § 1114(1); (2) federal unfair competition, 15 U.S.C. § 1125(a); (3) state trademark infringement, Mo.Rev.Stat. § 417.056; (4) common law unfair competition; and (5) state law trademark dilution, Mo.Rev.Stat. § 417.061. It sought one dollar in nominal damages and injunctive relief.

Other than the Balducci ad itself, the primary evidence offered by Anheuser–Busch was a study designed by Jacob Jacoby, Ph. D., and conducted under the supervision of Leon B. Kaplan, Ph.D. This survey, conducted in St. Louis shopping malls, involved 301 beer drinkers or purchasers who claimed to periodically review magazines or newspapers. The surveyors showed the Balducci ad to 200 participants and a Michelob Dry ad to the remaining 101. Of those viewing the Balducci ad, many expressed an impression of Anheuser–Busch's role in its creation. For example, fifty-eight percent felt the creators "did have to get permission to use the Michelob name." Fifty-six percent believed permission would be required for the various symbols and logos. Six percent of the classified [2] responses construed the Balducci ad to

---

1. Clip-art consists of collections of pictures which may be inserted into a new publishing application, such as an advertisement. Anheuser–Busch distributes clip-art to ensure accurate and consistent representation of its marks.

2. The staff at Princeton Research & Data Consulting Center, Inc. classified the answers to open-ended questions. Balducci objects to this classification process generally, but offers no per-

be an actual Anheuser–Busch advertisement. Almost half (45%) found nothing about the parody which suggested it was an editorial, and seventy-five percent did not perceive it as satirical. Virtually none (3.5%) noticed the tiny disclaimer on the side of the ad. Fifty-five percent construed the parody as suggesting that Michelob beer is or was in some way contaminated with oil. As a result, twenty-two percent stated they were less likely to buy Michelob beer in the future.

After a bench trial, the district court ruled in favor of Balducci on each of the five theories. Although the court found that "Defendants clearly used Plaintiff's marks in their ad parody, they used some of those marks without alteration, and they did so without Plaintiff's permission," it dismissed the trademark claims because "Defendants' use of [the] marks did not create a likelihood of confusion in the marketplace." *Anheuser–Busch, Inc. v. Balducci Publications,* 814 F.Supp. 791, 793. In reaching this decision, the court expressed the need to give "special sensitivity" to the First Amendment aspects of the case. *Id.* at 796. Accordingly, the court concluded that although "Plaintiff's statistical evidence [might] well be persuasive in the context of a classic trademark infringement case,.... where the allegedly infringing use occurs in an editorial context," more persuasive evidence of confusion is required. *Id.* at 797. The court similarly dismissed the state law dilution claim, stating that "because Defendant's use of Plaintiff's marks occurred in an editorial context, there is no threat of tarnishment through association with shoddy or disharmonious products." *Id.* at 799. Finally, the court rejected the unfair competition claims because the "parody was not in any way connected with the sale of a product and because Plaintiff has failed to establish a likelihood of confusion in the marketplace." *Id.* at 798.

On appeal, Anheuser–Busch contends the district court gave inordinate weight to Balducci's First Amendment claims and erred in finding no likelihood of confusion. Balducci contends the court correctly found no likelihood of confusion and, furthermore, argues

the ad parody is absolutely protected by the First Amendment.

## I.

■ This case involves the tension between the protection afforded by the Lanham Act to trademark owners and the competing First Amendment rights of the parodist. Our analysis of the district court's decision encompasses two related, but distinct steps. We begin by considering whether the district court erred in finding no likelihood of confusion. Since a trademark infringement action requires a likelihood of confusion, this finding, if upheld, decides this case. If we conclude the court erred in finding no likelihood of confusion, we must consider Balducci's additional argument that the First Amendment protects it from liability.

■ Section 32(1) of the Lanham Act protects owners of registered trademarks from uses "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). The determination of whether "likelihood of confusion" exists is a factual determination which we review under the clearly erroneous standard. *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 398 (8th Cir.1987); *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980). However, our review is not so limited when, as here, the district court's "conclusions are inextricably bound up in its view of the law." *Calvin Klein Cosmetics Corp. v. Lenox Labs.,* 815 F.2d 500, 504 (8th Cir.1987). Rather than first considering whether Balducci's ad parody was likely to confuse the public and then considering the scope of First Amendment protection, the district court conflated the two. The court essentially skewed its likelihood of confusion analysis in an attempt to give "special sensitivity" to the First Amendment, holding Anheuser Busch to a higher standard than required in a "classic trademark infringement case." *Balducci,* 814 F.Supp. at 796–97. Since we cannot separate the court's factual finding of confusion from its legal conclusions, we conduct a de novo review of the well-developed record before us. *Calvin Klein,* 815 F.2d at 504.

suasive evidence that any significant number of responses have been erroneously classified.

774

Many courts have applied, we believe correctly, an expansive interpretation of likelihood of confusion, extending "protection against use of [plaintiff's] mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." McCarthy, *Trademarks and Unfair Competition* § 24.03, at 24–13 (3d ed. 1992); *Novak,* 836 F.2d at 398; *Nike, Inc. v. "Just Did It" Enters.,* 6 F.3d 1225, 1228 (7th Cir.1993); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979); *Jordache Enters., Inc. v. Levi Strauss,* 841 F.Supp. 506, 514–15 (S.D.N.Y.1994). This approach seems consistent with congressional intent, as evidenced by the express inclusion during the 1989 revision of the Lanham Act of protection against confusion as to "origin, sponsorship, or approval." 15 U.S.C. § 1125(a). This court enumerated several factors pertinent to the finding of likelihood of confusion in *SquirtCo,* 628 F.2d at 1091: (1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers. These factors are not a distinct test, but represent the sort of considerations which a court should consider in determining whether likelihood of confusion exists. We briefly consider the application of these factors to this case.

Anheuser–Busch possessed several very strong[3] trademarks that Balducci displayed virtually unaltered in the ad parody. Thus, the first two *SquirtCo* factors weigh heavily in favor of Anheuser–Busch. The third factor, competitive proximity, is less one-sided. Balducci does not directly compete with Anheuser–Busch. Confusion, however, may exist in the absence of direct competition. *SquirtCo,* 628 F.2d at 1091. Moreover, Balducci published the parody on the

back cover of a magazine—a location frequently devoted to real ads, even in *Snicker.* This location threatens to confuse consumers accustomed to seeing advertisements on the back cover of magazines.

Our analysis of Balducci's intent relies, of necessity, on circumstantial evidence. According to Richard Balducci, he sought to comment on certain social conditions through parody. "An intent to parody is not an intent to confuse." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir.1987). Other factors, however, suggest Balducci had, if not an intent to confuse, at least an indifference to the possibility that some consumers might be misled by the parody. For example, no significant steps were taken to remind readers that they were viewing a parody and not an advertisement sponsored or approved by Anheuser–Busch. Balducci carefully designed the fictitious ad to appear as authentic as possible. Several of Anheuser–Busch's marks were used with little or no alteration. The disclaimer is virtually undetectable. Balducci even included a ® symbol after the words Michelob Oily. These facts suggest that Balducci sought to do far more than just "conjure up" an image of Anheuser–Busch in the minds of its readers. *Cf. Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 758 (9th Cir.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979) (in copyright context, "fair use" doctrine does not entitle parodist to copy everything needed to create the "best parody;" rather, the parodist may copy only that portion of the protected work necessary to "conjure up the original"). These factors limit the degree to which Balducci's intent to parody weighs in favor of a finding of no likelihood of confusion.

Balducci's desired message, or humor, presumably hinged on consumers' ultimate realization that although this "advertisement" was based on the painstaking duplication of Anheuser–Busch's marks, it was in fact a parody or editorial parody. We have significant doubt as to whether many consumers would develop this understanding of Balduc-

---

**3.** Balducci concedes that Anheuser–Busch's trademarks, developed through sizeable and prolonged advertising, are quite strong.

ci's true purpose. There is a distinct possibility, accepted by the district court, "that a superficial observer might believe that the ad parody was approved by Anheuser–Busch." *Balducci*, 814 F.Supp. at 797. The back cover of magazines is frequently used for advertisements and cannot be expected to command the thoughtful deliberation of all or even most of the viewing public. The district court downplayed this fact, observing that "[o]nce again ... the First Amendment concerns at issue in this litigation require a closer examination of Plaintiff's claims." *Id.* When objectively viewed, the fourth and sixth *SquirtCo* factors (i.e., intent and degree of care) may not fully support Anheuser–Busch, but they are consistent with a finding that the parody presented a significant likelihood of confusing consumers.

The survey evidence, whether considered as direct or indirect evidence of actual confusion, tilts the analysis in favor of Anheuser–Busch. Over half of those surveyed thought Balducci needed Anheuser–Busch's approval to publish the ad. Many of these presumably felt that such approval had in fact been obtained. Six percent thought that the parody was an actual Anheuser–Busch advertisement. Other courts have accepted similar survey findings. *See Novak*, 836 F.2d at 400; *Nat'l Football League Props., Inc. v. New Jersey Giants, Inc.*, 637 F.Supp. 507, 517 (D.N.J.1986) (citing decisions relying on surveys showing 8.5% to 15% confusion); *Schieffelin & Co. v. Jack Company of Boca*, 850 F.Supp. 232, 247–48 (S.D.N.Y.1994). In *Novak*, for example, "approximately ten percent of all the persons surveyed thought that Mutual 'goes along' with Novak's product." 836 F.2d at 400. The court found this persuasive despite the existence of "some ambiguity" in the survey question. *Id.* Thus, we are left with evidence, obtained by means of a valid consumer survey, that strongly indicates actual consumer confusion.

Our review of the record before the district court, including the Balducci ad and the survey evidence,[4] convinces us that the court erred in finding no likelihood of confusion.

The court reached its finding only after it mistakenly weighted its analysis in favor of Balducci in an effort to satisfy the limits set by the First Amendment. We believe the better course would have been to analyze the likelihood of confusion first and then proceed to an analysis of the First Amendment issues.

■ Having determined that a likelihood of confusion exists, we must next consider Balducci's argument that the First Amendment protects it from liability for its ad parody. Parody does implicate the First Amendment's protection of artistic expression. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group*, 886 F.2d 490, 493 (2d Cir.1989). Based on this, Balducci argues it has an absolute First·Amendment right to use plaintiff's trademarks in its parody. No such absolute right exists. *See id.* at 493–94 ("Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression.") (quoting *Silverman v. CBS Inc.*, 870 F.2d 40, 49 (2d Cir.), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989)); *Nike*, 6 F.3d at 1228; *Dallas Cowboys Cheerleaders*, 604 F.2d at 206 (defendant liable for using cheerleader uniform in X-rated film); *Pillsbury Co. v. Milky Way Productions, Inc.*, 215 U.S.P.Q. 124, 135 (N.D.Ga.1981) (defendant liable for dilution for publishing cartoon of "Poppin' Fresh" and "Poppie Fresh" doughpersons engaging in sexual intercourse and fellatio); *Edgar Rice Burroughs, Inc. v. Manns Theaters*, 195 U.S.P.Q. 159, 162 (C.D.Cal.1976) (defendant liable for using TARZAN mark in X-rated film).

■ In arguing against the reasoning of these many cases, Balducci relies on this court's opinion in *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397 (8th Cir.1987), *cert. denied*, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988). In *Novak*, a panel of this court upheld an injunction against Novak's continued sale of anti-war T-shirts, coffee mugs and other products containing

---

4. We have considered Balducci's argument attacking the survey's findings because of alleged shortcomings in its methodology; however, like the district court, we have "no quarrel with the [survey's] design or execution." *Balducci*, 814 F.Supp. at 797; *cf. ConAgra, Inc. v. Geo. A. Hormel & Co.*, 784 F.Supp. 700, 734 (D.Neb. 1992), *aff'd*, 990 F.2d 368 (8th Cir.1993).

words such as "Mutants of Omaha" and bearing symbols with a likeness to plaintiff's Indian head logo. *Id.* at 398. In dicta, the court stated that the injunction "in no way infringes upon the constitutional protection the First Amendment would provide were Novak to present an editorial parody in a book, magazine, or film." *Id.* at 402. This language does not support absolute protection for editorial parody, but merely reflects the fact that a parody contained in an obvious editorial context is less likely to confuse, and thus more deserving of protection than those displayed on a product. *See Nike*, 6 F.3d at 1228; *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 625 F.Supp. 48, 55 (D.N.M.1985), *aff'd,* 828 F.2d 1482 (10th Cir.1987); 3 J.T. McCarthy § 31:38 at 31–213. A parody creating a likelihood of confusion may be subject to a trademark infringement action. *Cliffs Notes,* 886 F.2d at 494 (confusing parodies are "vulnerable under trademark law"); *L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 32 n. 3 (1st Cir.) (confusing parodies "implicate[ ] the legitimate commercial and consumer protection objectives of trademark law"), *cert. denied and appeal dismissed,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).

There is no simple, mechanical rule by which courts can determine when a potentially confusing parody falls within the First Amendment's protective reach. Thus, "in deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion." *Cliffs Notes,* 886 F.2d at 494. "This approach takes into account the ultimate test in trademark law, namely, the likelihood of confusion as to the source of the goods in question." *Id.* at 495 (internal quotations omitted).

 In applying this balancing test, we begin with the recognition that parody serves as a "humorous form of social commentary and literary criticism that dates back as far as Greek antiquity." *Bean,* 811 F.2d at 28. Balducci purports to comment on several matters, including environmental pollution and Anheuser–Busch's brand proliferation.

The First Amendment's protection of social commentary generally, and parody in particular, is certainly implicated in this case. "The fact that parody can claim legitimacy for some appropriation does not, of course, tell either parodist or judge much about where to draw the line." *Campbell v. Acuff-Rose Music, Inc.,* ── U.S. ──, ──, 114 S.Ct. 1164, 1172, 127 L.Ed.2d 500 (1994). "The benefit to the one making the parody ... arises from the humorous association, not from public confusion as to the source of the marks." *Jordache Enters.,* 828 F.2d at 1486. Thus, we must weigh the public interest in protecting Balducci's expression against the public interest in avoiding consumer confusion.

Applying this standard, we are convinced that the First Amendment places no bar to the application of the Lanham Act in this case. As we have discussed, Balducci's ad parody was likely to confuse consumers as to its origin, sponsorship or approval. This confusion might have to be tolerated if even plausibly necessary to achieve the desired commentary—a question we need not decide. In this case, the confusion is wholly unnecessary to Balducci's stated purpose. By using an obvious disclaimer, positioning the parody in a less-confusing location, altering the protected marks in a meaningful way, or doing some collection of the above, Balducci could have conveyed its message with substantially less risk of consumer confusion. Other courts have upheld the use of obvious variations of protected marks. *See, e.g., Cliffs Notes,* 886 F.2d at 496 ("Spy Notes" held not to infringe "Cliffs Notes" mark); *Jordache Enters.,* 828 F.2d at 1485–88 (comparing "Jordache" and "Lardashe" jeans). The First Amendment does not excuse Balducci's failure to do so. As the Second Circuit observed:

> A parody must convey two simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the original and is instead a parody. To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused.

*Cliffs Notes,* 886 F.2d at 494; *see Nike,* 6 F.3d at 1228. Balducci's ad, developed through the nearly unaltered appropriation of Anheuser–Busch's marks, conveys that it is the original, but the ad founders on its failure to convey that it is not the original. Thus, it is vulnerable under trademark law since the customer is likely to be confused, as the record before the district court demonstrated.

■ We believe it is important to acknowledge the limits of our holding today. We do not hold that Balducci's extensive borrowing of Anheuser–Busch's trademarks amounts to a per se trademark violation. Unlike copyright and patent owners, trademark owners have no right in gross. *See McCarthy* § 24.03[4][d]; *Jordache,* 625 F.Supp. at 56 (trademark owner "does not own in gross the penumbral customer awareness of its name, nor the fallout from its advertising"). By taking steps to insure that viewers adequately understood this was an unauthorized editorial, Balducci might have avoided or at least sharply limited any confusion, and thereby escaped from liability. Absent such measures, Balducci's ad parody was likely to confuse consumers and fall subject to federal trademark law.

## II.

■ Although our trademark infringement holding dictates our disposition of this case, we must discuss Anheuser–Busch's dilution claim because the validity of this claim may affect the relief available to it.[5]

■ Missouri's anti-dilution statute provides that "[l]ikelihood of injury to business reputation or dilution of the distinctive quality of a mark ... shall be a ground for injunctive relief." Mo.Rev.Stat. § 417.061. This statute provides greater protection than the Lanham Act by expressly permitting claims "notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." *Id.* Dilution comes in two distinct forms. The most common form prohibits

uses which, although not likely to confuse consumers as to source, tend to weaken the unique association of the mark with the trademark owner. *See, e.g., Tiffany & Co. v. Boston Club, Inc.,* 231 F.Supp. 836, 844 (D.Mass.1964) (enjoining Boston restaurant's use of New York jeweler's "Tiffany" mark). More applicable to this case, however, is the second form of dilution—commonly referred to as "tarnishment." Courts have frequently enjoined the "tarnishment" of a mark through association with unsavory goods, persons or services. *See, e.g., Chemical Corp. of America v. Anheuser–Busch, Inc.,* 306 F.2d 433, 436–38 (5th Cir.1962) (enjoining use of "Where there's life ... there's bugs!" slogan), *cert. denied,* 372 U.S. 965, 83 S.Ct. 1089, 10 L.Ed.2d 129 (1963); *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.,* 642 F.Supp. 1031, 1039 (N.D.Ga.1986) (tarnishment "occurs when a defendant uses the same or similar marks in a way that creates an undesirable, unwholesome, or unsavory mental association with the plaintiff's mark"); *Pillsbury,* 215 U.S.P.Q. at 135 (enjoining cartoon portrayal of trade characters engaged in sexual intercourse and fellatio published in adult magazine); *American Express Co. v. Vibra Approved Laboratories Corp.,* 10 U.S.P.Q.2d 2006, 2013, 1989 WL 39679 (S.D.N.Y.1989) (enjoining defendant's use of plaintiff's trademark in distribution of condom credit card); *Coca–Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1190–91 (E.D.N.Y.1972) (enjoining "Enjoy Cocaine" posters because customers might be "turned off" by so-called "spoof").

In this case, the majority of those surveyed construed the ad parody as suggesting that Michelob beer contains oil. This relationship obviously tarnishes the marks' carefully-developed images. Moreover, the tarnishment results from a negative, although vague, statement about the quality of the product represented by the trademark. The plain language of the Missouri anti-dilution statute reaches this situation.

5. For example, the Missouri anti-dilution statute requires automatic imposition of an injunction. *See Gilbert/Robinson, Inc. v. Carrie Beverage—Missouri, Inc.,* 758 F.Supp. 512, 528 (E.D.Mo. 1991), *aff'd,* 989 F.2d 985 (8th Cir.), and *cert. denied,* ⸺ U.S. ⸺, 114 S.Ct. 338, 126 L.Ed.2d 282 (1993).

■ Balducci argues that the application of the anti-dilution statute to enjoin the ad parody's publication would violate the First Amendment. Balducci contends that the First Amendment prevents any construction of an anti-dilution statute that would enjoin perceived tarnishment in a non-commercial context. The only case we discovered which supports such a sweeping statement is *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir.), *cert. denied and appeal dismissed*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). In *Bean*, the First Circuit considered a parody of the plaintiff's mail-order catalog. The parody, contained in an adult erotic magazine, consisted of a two-page article entitled "L.L. Bea*m*'s Back-to-School-Sex-Catalog." (Emphasis added.) The article portrayed nude models using fictitious products in sexually explicit manners and contained facsimiles of Bean's trademarks. The court concluded that applying the Maine anti-dilution statute would be unconstitutional because the First Amendment protects the "use of a trademark in a non-commercial setting such as an editorial or artistic context." *Id.* at 33.

We reject Balducci's First Amendment argument. We begin by observing that Balducci's analysis conflicts with the holding of several cases. *See, e.g., Pillsbury*, 215 U.S.P.Q. at 135; *Coca–Cola Co.*, 346 F.Supp. at 1191–93. Moreover, the facts in *Bean* differ significantly from the facts in this appeal. First, the catalog parody made no derogatory comment about Bean's products' quality. Balducci's parody, as demonstrated by the survey, suggested that Anheuser–Busch products were contaminated with oil. This unsupported attack was not even remotely necessary to Balducci's goals of commenting on the Gasconade oil spill and water pollution generally. Nor does Balducci's asserted purpose of commenting on Anheuser–Busch's brand proliferation give it carte blanche to attack Anheuser–Busch products. Second, and more importantly, the catalog parody was located inside a 100–page magazine. *Bean*, 811 F.2d at 32. Readers presumably discovered it only after perusing the magazine or reviewing the table of contents, which labelled the article as "humor" and "parody." In contrast, Balducci placed its

parody on the back cover with only a tiny disclosure. Thus, the casual viewer might fail to appreciate its editorial purpose. Even the *Bean* court felt it significant that "neither the [catalog parody] nor appellant's trademark was featured on the front or back cover of the magazine." *Id.* For these reasons, as well as those contained in our discussion of Balducci's First Amendment arguments in the trademark context, we conclude the district court erred in dismissing Anheuser–Busch's dilution claims.

## III.

■ The final question presented in this case involves the proper remedy. Anheuser–Busch seeks one dollar in damages and an injunction against further infringement. The requested nominal damages seem proper given the survey evidence suggesting actual confusion. *See Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir.1987) (awarding damages based on survey evidence); *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir.1987) (same).

■ Injunctive relief is also appropriate and, under the Missouri anti-dilution statute, required. The injunction sought by Anheuser–Busch, however, is quite broad. It would permanently enjoin Balducci from publishing any "false description" of Anheuser–Busch products or "publishing [the protected marks in] ... any documents or material." This relief seems to encompass a great number of uses which might amount to no infringement at all. Courts should tread cautiously when considering injunctive relief against future publication. The proponent of prior restraint " 'carries a heavy burden of showing justification for the imposition of such a restraint.' " *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). The parties have not developed a satisfactory record or fully briefed this issue. Thus, we decline to delineate the precise limits which the First Amendment might place on the

scope of the injunctive relief available to Anheuser–Busch.

We reverse the district court's dismissal of Anheuser–Busch's trademark infringement (15 U.S.C. § 1114(1)) and dilution (Mo.Rev. Stat. § 417.061) claims and instruct the district court to enter judgment for Anheuser–Busch on these claims and award appropriate relief.

780

## APPENDIX A

Reduced-size reproduction. Original is on 11-1/4 x 17-1/2 inch page.

## APPENDIX B

Full-size reproduction of lower-right corner of Appendix A.

imped into our
rs, you'll drink it
yway.

*Snicker Magazine Editorial by Rich Balducci. Art by Eugene Ruble. Thank goodness someone still cares about quality (of life).*