# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2980

_____

Georgia-Pacific Consumer Products LP,    *
                                     *

         Plaintiff - Appellant,        *

                                       *     Appeal from the United States

v.                                       *     District Court for the

                                       *     Western District of Arkansas.

Myers Supply, Inc.,                *

                                       *

         Defendant - Appellee.       *

_____

Submitted: June 17, 2010
Filed: September 15, 2010

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Following a bench trial, the district court[1] entered judgment for Myers Supply, Inc. on Georgia-Pacific Consumer Products LP's claim for contributory trademark infringement. Earlier, the district court granted summary judgment to Myers, on Georgia-Pacific's claim for tortious interference with contractual relationship. Georgia-Pacific appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

_____

[1] The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

# I.

Georgia-Pacific manufactures paper-towel dispensers and disposable paper towels. In 2002, it introduced a touch-less paper-towel dispenser, "enMotion." The enMotion dispenser displays federally registered enMotion and Georgia-Pacific trademarks. Georgia-Pacific also makes a 10-inch-wide, paper-towel roll for use in the enMotion dispenser. The towels have no trademarks printed on them. The packaging, however, clearly identifies Georgia-Pacific as the manufacturer.

Georgia-Pacific considers the enMotion a "proprietary" dispenser. Georgia-Pacific does not sell the enMotions, but leases them to distributors. From the distributor, Georgia-Pacific receives a small initial payment and seeks to profit from paper-towel sales for the dispensers. Distributors may sublease the dispensers at prices they choose. The distributor is supposed to require sublessees to fill the dispenser with Georgia-Pacific towels. Whether or not the distributor makes an agreement with the sublessee, a sticker and warranty card inside the dispensers state that only Georgia-Pacific towels may be used.

Georgia-Pacific also manufactures "universal" towel dispensers–non-proprietary dispensers also bearing Georgia-Pacific trademarks. It is common practice in the industry, and not improper, to put one brand of towels in an unleased, universal dispenser displaying a different manufacturer's trademarks. Georgia-Pacific sells towels for use in other manufacturers' trademarked dispensers; its catalogue suggests towels that replace other manufacturers' towels.

In 2003, Georgia-Pacific leased enMotion dispensers to one of its distributors, Brown Janitorial Supply. Brown distributed the enMotion dispensers to business and not-for-profit entities, including a Baptist church and a school district–the end-users. Myers, the defendant in this case, is also a distributor of other paper-towels and paper-towel dispensers. In 2007, Myers began selling a 10-inch-wide paper towel

manufactured by von Drehle Corporation, the "810-B towel," which works in the enMotion dispensers. At that time, the enMotion was the only 10-inch dispenser widely available. Myers knew "with 99 percent" certainty that the 810-B towels would be used in enMotion dispensers. The 810-B towels are less expensive than enMotion towels and have a paper-like, "crinkly" feel, unlike the more cloth-like feel of enMotion towels. The packaging on the 810-B towels clearly identifies von Drehle as the manufacturer, although the towels themselves have no identifying marks. Because of the packaging on the von Drehle (and Georgia-Pacific) towels, purchasers have no uncertainty about the source of the towels. The purchaser decides what kind of towel to use, actually loading them into the dispensers.

Myers sold 810-B towels to the Baptist church and the school district. Georgia-Pacific sent Myers a cease-and-desist letter stating that enMotion dispensers are property of Georgia-Pacific and subject to lease and sublease agreements. Georgia-Pacific accused Myers of trademark infringement and tortious interference with Georgia-Pacific's distributors and the end-user purchasers. In reply, Myers demanded evidence of signed subleases and continued selling the 810-B towels. Georgia-Pacific did not provide Myers with subleases containing a towel-use restriction signed by the Baptist church or school district. The evidence presented at the district court includes duplicates of the front side of what Georgia-Pacific claims to be sublease agreements between Brown and the Baptist church, and the school district. Also in evidence is the back side of a sample sublease that Georgia-Pacific claims is the back side of all sublease agreements. The sample sublease requires the sublessee to use only Georgia-Pacific towels in subleased Georgia-Pacific dispensers. Georgia-Pacific did not produce subleases containing a towel-use restriction signed by the Baptists church or the school district.

Georgia-Pacific claims that Myers committed contributory trademark infringement by selling 810-B towels knowing that they would be placed in enMotion dispensers. Georgia-Pacific also contends that Myers's actions constitute tortious

-3-

interference with the contracts requiring end-users to use Georgia-Pacific paper towels in enMotion dispensers. After a bench trial, the district court ruled for Myers on the contributory infringement claim, finding no likelihood of confusion by consumers. The district court had earlier granted summary judgment against Georgia-Pacific on the tortious interference claim, finding that Georgia-Pacific could not prove that Myers intentionally caused the end-users to breach sublease agreements, or that its conduct was improper.

## II.

To prove contributory infringement, Georgia-Pacific must establish that Myers continued to supply towels to its customers with knowledge that they were engaging in trademark infringement with the paper towels. *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982). Because there is no dispute that Myers knew that its customers were putting 810-B towels in enMotion dispensers, the district court's only consideration was whether this infringed Georgia-Pacific's trademarks.

To establish actual infringement under the Lanham Act, a mark must be used in commerce in connection with a product in a manner that is likely to cause confusion as to the source or sponsorship of the product. **15 U.S.C. § 1125(a)(1)(A).** The issue is whether the trademarks on a towel dispenser are "source-identifying," meaning they identify the source of the paper towels inside, so that putting von Drehle's 810-B towels in the enMotion dispenser creates a likelihood of confusion as to the brand of the towels. The district court found no likelihood that purchasers or consumers would be confused and believe that the trademark on the dispenser indicates the source of the towels inside. This court reviews the district court's determination of likelihood of confusion, which is a question of fact, for clear error. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1053-54 (8th Cir. 2005). If there are two permissible views of the evidence, "the fact-finder's choice between

them cannot be clearly erroneous." ***Anderson v. City of Bessemer City***, 470 U.S. 564, 574 (1985).

To determine a likelihood of confusion, this court considers six factors: 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's mark and the alleged infringing mark; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion. ***Davis v. Walt Disney Co.***, 430 F.3d 901, 903 (8th Cir. 2005), *citing* ***SquirtCo v. Seven-Up Co.***, 628 F.2d 1086, 1091 (8th Cir. 1980). Each case is unique, and the factors are useful only to the extent they answer the ultimate question – in this case, whether a trademark on a towel dispenser is source-identifying for the towels inside.

First, the district court found that Georgia-Pacific's trademarks are strong. Second, it found that because the von Drehle marks are not visible once the 810-B towels are put in an enMotion dispenser, the second factor is neutral. Third, the court found that the von Drehle 810-B competes directly with the enMotion towel. Fourth, relying on testimony that it was common in the industry to "stuff" one brand of towel in a dispenser of a different brand, the district court found no intent to confuse the public, by either the end-users or Myers. Fifth, the court found a low degree of care by bathroom consumers. While this normally favors the plaintiff, the district court stated that here, this lack of care shows that the marks on a dispenser do not identify the source of the towels inside. The court also found that the end-users have a high-degree of care, and are fully aware of the source of the towels they purchase.

Finally, the district court found that there was no actual confusion in the marketplace. The court examined the experiences of both the end-user and the bathroom consumer, focusing on the latter. As mentioned, the end-users are fully aware of the brand of towel they stuff into their dispensers, thus there is no actual

confusion as to the source of the towel–a determination unchallenged by Georgia-Pacific. In deciding that there was no actual confusion by bathroom consumers, the court considered the consumer-surveys submitted by both sides, but relied more on the general industry practice of stuffing unleased dispensers with other company's towels.

Georgia-Pacific contends that the district court abused its discretion in discounting consumer-surveys it claims show a likelihood of confusion by bathroom consumers. Georgia-Pacific invokes the recent Fourth Circuit decision in *Georgia-Pacific Consumer Products, LP v. Von Drehle Corp.*, ___ F.3d ___, 2010 WL 3155646 (4th Cir. Aug. 10, 2010). In that case, the Fourth Circuit reversed a grant of summary judgment, resuscitating Georgia-Pacific's claim of contributory trademark infringement against von Drehle. According to the Fourth Circuit, the district court erred as a matter of law by not examining the likelihood of confusion among bathroom consumers when determining the overall likelihood of confusion. Significantly, the Fourth Circuit rendered no opinion whether Georgia-Pacific had proven a likelihood of confusion by bathroom consumers. Rather, it held only that the evidence offered by Georgia-Pacific–the same consumer-surveys presented in this circuit–created a genuine issue of material fact as to the likelihood of confusion, remanding the case for trial.

The district court here, like the Fourth Circuit, denied summary judgment; it held a bench trial. Considering all the facts, including the consumer-surveys, the district court found no likelihood of confusion. Because the court here fully considered the evidence relating to confusion by bathroom consumers, the Fourth Circuit's decision is not helpful in this case.

At trial, Georgia-Pacific presented the testimony and consumer survey of Dr. Eli Seggev. Survey participants washed their hands and then dried them with an enMotion towel from an enMotion dispenser bearing its trademarks. Asked the source

of the towels, 23 percent answered that they thought the brand of the towel was the same as the brand of the dispenser. Kenneth A. Hollander provided expert testimony for Myers, critiquing the methodology of the Seggev survey, and discussing his own consumer survey. According to the Hollander survey, 11.4% of respondents almost always thought that the brand on the dispenser was the same as the towels, and 36.5% thought they were sometimes the same.

After hearing the testimony of Dr. Seggev and Mr. Hollander, the district court found that there were several methodological problems with the Seggev survey, including the artificial environment, the leading nature of the questions, and the lack of a control. Most importantly, the court, after a thorough discussion, found that the entire premise of the survey was flawed, as this type of survey helps determine the likelihood of confusion between two marks, not whether a mark on one product is source-identifying of a complementary unmarked product. Because this type of survey presupposes that the mark in question is source-identifying, the court found the probative value of the survey to be severely limited.

Georgia-Pacific contends that even with the Seggev survey discounted, the Hollander survey, by itself, establishes a likelihood of confusion, and that the district court clearly erred by finding no likelihood of confusion. *See Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 775 (8th Cir. 1994) (survey showing 6% of respondents thought a spoof was an actual Anheuser-Busch advertisement and over 50% thought Anheuser-Busch approved it, was strong indication of consumer confusion); *Mutual of Omaha v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (survey showing 10% thought Mutual of Omaha "goes along" with Novak's product was strong evidence of likelihood of confusion); *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) (survey showing 15% confusion was sufficient).

While the district court noted that the Hollander survey's 11.4% was a small number, it did not find a lack of confusion by bathroom consumers solely on that basis. The court found more probative the non-expert testimony of industry insiders that consistently showed it was unobjectionable and common practice to put towels of one brand into a dispenser of a different brand. Highly relevant was the testimony of Georgia-Pacific's own regional manager reiterating that it was acceptable practice to place towels of one brand in an unleased dispenser bearing the marks of a different brand. Further evidence is Georgia-Pacific's own catalogue, which suggests replacement towels for other manufacturers' towels, including other manfucturers' controlled brands. Georgia-Pacific argues that this testimony only related to dispensers that were unleased, not to dispensers like the enMotion. This argument is undermined by Georgia-Pacific's own practices. Whether or not a towel dispenser is leased has no bearing on the actual confusion by the bathroom consumer; there is no evidence that bathroom consumers of towel dispensers know whether the dispenser they are using is leased or unleased.

The district court did not abuse its discretion in discounting the survey evidence and crediting more the testimony from industry insiders, and thus correctly determined that there is no actual confusion by bathroom consumers. Nor did the court clearly err in finding that the trademark on a dispenser does not indicate the source of the paper towels inside, and concluding that there was no likelihood of confusion, and thus no trademark infringement.

### III.

Georgia-Pacific argues that the district court erred in dismissing on summary judgment its claim for tortious interference with contractual relationship. A grant of summary judgment is reviewed de novo. *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 603 (8th Cir. 2006). Summary judgment is appropriate if the evidence, viewed most favorably to the nonmovant, shows no

genuine issue of material fact and that the movant is entitled to judgment as a matter of law. **Fed. R. Civ. P. 56(c)(2)**.

Under Arkansas law, a claim for tortious interference with contractual relationship has five elements: (1) the existence of a valid contractual relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference inducing or causing a breach of the relationship by the defendant; (4) damage to the party whose relationship has been disrupted; and (5) improper conduct by the defendant. *Vowell v. Fairfield Bay Cmty. Club, Inc.*, 58 S.W.3d 324, 329 (Ark. 2001).

The district court determined that Georgia-Pacific could not establish the elements of intentional interference and improper conduct. It did not address whether Georgia-Pacific could establish the existence of a valid sublease between Brown and the Baptist church or the school district (of which Georgia-Pacific claims to be a third-party beneficiary), or Myers's knowledge of such a sublease. These are close questions as no signed sublease with the towel restriction was produced.[2] Additionally, Georgia-Pacific was not consistent in obtaining signed subleases or explaining the towel-use restriction to end-users. This task was left to distributors like Brown. Its representative testified that he could not remember telling the Baptist church or the school district that they were required to use Georgia-Pacific towels in the enMotion dispensers. Further, before the sales to the church and school district, Georgia-Pacific's management was concerned that agreements were not being signed by end-users. After Georgia-Pacific sent the cease-and-desist letter, Myers began asking customers ordering 810-B towels if they had sublease agreements. No customer stated that it had a sublease.

---

[2] The Fourth Circuit, examining similar facts, stated that "the record cannot support a finding that G-P had contractual relationships with the end-user customers." *Georgia-Pacific Consumer Products, LP,* 2010 WL 3155646, at *14.

This court, however, need not decide whether a valid contract existed or whether Myers knew of one because the evidence shows that Myers's conduct was not improper. In determining whether an actor's conduct is improper, the court should consider "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties." *Baptist Health v. Murphy*, 226 S.W.3d 800, 809 (Ark. 2006), *citing* **Restatement (Second) of Torts § 767 (1979)**. *See also Vowell*, 58 S.W.3d at 329 ("We have considered the factors outlined in the Restatement . . . for guidance about what is improper.").

According to the Restatement, the nature of the actor's conduct is a chief factor in determining whether conduct is improper. The Restatement lists examples of ways an actor can cause interference, suggesting that depending on the circumstances, some ways are more likely to indicate improper conduct. **Restatement (Second) of Torts § 767 cmt. c (1979)**. As examples, the Restatement lists physical violence, misrepresentations, threats of civil suit made in bad faith, threats of criminal prosecution made in bad faith, conduct in violation of statute, economic pressure, and violation of business customs. *Id.*

In this case, the nature of Myers's conduct indicates that it did not act improperly. As the district court found, Georgia-Pacific failed to offer sufficient evidence that Myers did anything other than sell towels to its customers. *See K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC,* 280 S.W.3d 1, 12 (Ark. 2008) (affirming summary judgment because appellant failed to "provide specific facts or evidence" of improper conduct). Georgia-Pacific agrees that the sale of 810-B towels for use other than in a *leased* enMotion dispenser is unobjectionable, and that the end-users' purchase of the 810-B towel does not breach the sublease agreement.

-10-

Rather, Georgia-Pacific contests only the end-users' act of placing 810-B towels in enMotion dispensers (as Myers does not itself put 810-B towels in enMotion dispensers). Georgia-Pacific concedes that it is a common and acceptable practice in the industry to put a different brand of towel in an unleased dispenser bearing another manufacturer's trademarks. This is important, because if there was no sublease requiring the use of Georgia-Pacific towels, then it is acceptable to put 810-B towels in the enMotion dispensers. And while Myers knew with 99 percent certainty that its customers were putting 810-B towels in enMotion dispensers, the evidence does not show that Myers knew they were doing so in violation of a sublease. At trial, Ryan Myers acknowledged that in 2007 and 2008 there was a "99 percent" probability that customers buying 810-B towels were placing them in enMotion dispensers. There is, however, no evidence in the record that Myers knew that the towels were being placed in leased dispensers. Myers attempted to confirm Georgia-Pacific's cease-and-desist allegations by asking Georgia-Pacific for signed subleases. Georgia-Pacific never provided any. Additionally, Myers asked its customers whether they had sublease agreements with Georgia-Pacific, and none stated they did.

Other factors also weigh in favor of Myers. Georgia-Pacific has not suggested that Myers was motivated by any desire other than to fill the orders of its customers. Significantly, Myers explained, and Georgia Pacific has not refuted, that it was the Baptist church that approached Myers looking for towels to put in the EnMotion dispensers. Georgia-Pacific's interest was to sell its towels to the end-users of the enMotion dispensers; Myers's interest was to sell towels to its customers. As the district court said, society has an interest in promoting competition without burdening a seller with controlling its customers' uses of goods. Myers's sale of 810-B towels to end-users is remote to the breach of any alleged sublease agreement because the purchase of 810-B towels did not breach a sublease. Rather, any breach resulted from using the 810-B towels in a leased enMotion dispenser.

Based on the record, the Baptist church and the school district could, at any time, return the dispensers, terminating the sublease; in fact, the church replaced the enMotion dispensers with a Bay West product. Similarly, Georgia-Pacific could, for any reason, repossess a leased dispenser. The agreement between Brown and the end-users was for an indefinite term and thus was an at-will contract. *See Griffin v. Erickson*, 642 S.W.2d 308, 310 (Ark. 1982) (explaining that an employment contract for an indefinite term is a "contract at will."). Under Arkansas law, there is a strong presumption that interference with an at-will contract is not improper. *See* **Restatement (Second) of Torts § 768 (1979)** (interfering with a contract that is terminable at will is less likely to be improper); *Mathis v. Liu***,** 276 F.3d 1027, 1030 (8th Cir. 2001) (emphasizing that interference with an at-will contract is less likely to be improper because it concerns future, not present, business relationships); *Mason v. Wal-Mart Stores, Inc.***,** 969 S.W.2d 160 (Ark. 1998) (affirming summary judgment for Wal-Mart, noting that its conduct was not improper where appellant, an at-will sales representative, was fired after Wal-Mart announced it would no longer deal with vendors who had independent sales representatives).

"[T]he real question is whether the actor's conduct was fair and reasonable under the circumstances." *Hayes v. Advanced Towing Servs., Inc.,* 40 S.W.3d 800, 805 (Ark. Ct. App. 2001) *citing* **Restatement (Second) of Torts § 767 cmt. j (1979)**. Georgia-Pacific has offered no specific facts or evidence to demonstrate that Myers's conduct was unfair or unreasonable. *See K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC,* 280 S.W.3d 1, 12 (Ark. 2008) (affirming summary judgment because appellant failed to "provide specific facts or evidence" of improper conduct). Accordingly, the district court did not err in granting Myers's motion for summary judgment on Georgia-Pacific's tortious interference claim.

## IV.

The judgment of the district court is affirmed.

-12-

BEAM, Circuit Judge, concurring and dissenting.

I concur in Parts I and II of the court's opinion. But, because I believe Georgia-Pacific has presented sufficient evidence to survive summary judgment on its claim of tortious interference with a contractual relationship, I dissent from Part III.

Under Arkansas law, tortious interference with a contractual relationship has five elements: (1) existence of a valid contractual relationship; (2) defendant's knowledge of that relationship; (3) defendant's intentional interference inducing or causing a breach of the relationship; (4) damage to the party whose relationship has been disrupted; and (5) improper conduct by the defendant. Vowell v. Fairfield Bay Cmty. Club, Inc., 58 S.W.3d 324, 329 (Ark. 2001). Accordingly, in order to survive summary judgment, Georgia-Pacific must have presented "sufficient probative evidence [of these five elements] permit[ting]  a finding in [its] favor on more than mere speculation, conjecture, or fantasy." Binkley v. Entergy Operations, Inc., 602 F.3d 928, 931 (8th Cir. 2010) (quotation omitted). The court asserts that it is not sure that Georgia-Pacific could establish (1) a valid contractual relationship, (2) defendant's knowledge, or (3) defendant's intentional interference. But, rather than rest its decision on any of those three elements, the court disposes of the claim on the fifth element, finding that Myers's conduct was not improper. Because I would find that Georgia-Pacific has submitted sufficient evidence to create a genuine issue of material fact as to the existence of all five elements, I would reverse the district court's grant of summary judgment on this issue.

As a preliminary matter, and as to the first element, I disagree with the court's suggestion that "no signed sublease with the towel restriction was produced." Ante at 9. In fact, Georgia-Pacific produced Sublease Agreements signed by both Gospel Light Baptist and Fountain Lake School. In both of the signed subleases, the parties acknowledged that the sublease was subject to "Customer's Terms of Use." And, Georgia-Pacific submitted the "Customer's Terms of Use," which states in relevant

-13-

part that the sublessees were "required to use the dispensers for the sole purpose of dispensing, under [Georgia-Pacific] trademarks, only [Georgia-Pacific's] branded towel . . . authorized for use in the dispensers and purchased from Distributor." In my view, such evidence is sufficient to establish the existence of a valid contractual relationship.

The second and third elements of the cause of action are also established by Myers's own admissions in the record, contrary to the court's stated doubts. First, as to knowledge, Myers admits that it received a cease and desist letter from Georgia-Pacific dated July 1, 2008. In that letter, Georgia-Pacific told Myers that its enMotion dispensers were subject to subleases and that Myers's selling 810-B towels to the sublessees tortiously interfered with those contracts. Such evidence is sufficient to show that Myers knew of the alleged contractual relationship. Second, as to breach, Myers admitted that it knew with 99 percent certainty that its customers were placing the 810-B towels it was selling into enMotion dispensers. Since Myers continued to sell the 810-B towels after receiving notice via the cease and desist letter, this is sufficient circumstantial evidence to indicate that Myers was intentionally selling the 810-B towels in an effort to induce the end-users to place that particular towel in enMotion dispensers in violation of the subleases. See Stewart Title Guar. Co. v. Am. Abstract & Title Co., 215 S.W.3d 596, 606 (Ark. 2005) (noting that the element of intent is met when the defendant knew that breach "was substantially certain to be produced by his conduct").

No one has disputed that Georgia-Pacific was damaged by Myers's conduct. The evidence indicates that Georgia-Pacific lost sales because the end-users purchased 810-B towels instead of the enMotion towels. Accordingly, Georgia-Pacific has submitted evidence to satisfy the fourth element as well.

As to the fifth element–improper conduct by the defendant–I disagree with the court's reasoning that this element was not met. It is accurate that "[u]nder Arkansas

-14-

law, a defendant is liable for tortious interference only if the defendant's interference with some relevant advantage was 'improper.'" Mathis v. Liu, 276 F.3d 1027, 1029 (8th Cir. 2002). And Arkansas courts "look to factors in § 767 of the Restatement (Second) of Torts for guidance about what is improper." K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC, 280 S.W.3d 1, 11 (Ark. 2008). In its analysis of the improper interference in this case, however, the court erroneously concludes that Myers's conduct was not, as a matter of law, improper.

Specifically, in concluding that Myers's conduct was not improper, the court states that "while Myers knew with 99 percent certainty that its customers were putting 810-B towels in enMotion dispensers, the evidence does not show that Myers knew they were doing so in violation of a sublease." Ante at 11. This summation of the evidence misses the mark. As I have noted, the evidence tends to show that Myers, via the cease and desist letter, knew that its customers' placement of 810-B towels in enMotion dispensers violated a sublease. Yet, Myers continued to sell the 810-B towels despite being 99 percent certain that the sublease-prohibited towels were being so used. In my estimation, such evidence, standing alone, sufficiently suggests that Myers had improper motives and knew that it was inducing the end-users to breach the subleases. And, as we have held, under Arkansas law, "inducing a breach of contract absent compelling justification is, in and of itself, improper." Mathis, 276 F.3d at 1030; see also Hayes v. Advanced Towing Servs., Inc., 40 S.W.3d 800, 804 (Ark. Ct. App. 2001) ("One who induces a third person not to perform his contract with another interferes directly with the other's contractual relations. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper.").

What the court essentially contends is that Myers presented sufficient evidence to suggest that its conduct was justified. In particular, the court states that Myers (1) attempted to get Georgia-Pacific to send it signed subleases; (2) asked their customers whether they had sublease agreements with Georgia-Pacific; (3) sold 810-B towels in

a mere effort to compete with Georgia-Pacific; and (4) did not actively place the 810-B towels in the dispensers. Whether this evidence constitutes a "compelling justification" for Myers's conduct is not for us to decide today. This is because the fact remains that Myers continued to sell the 810-B towels to its customers with a 99 percent certainty that the customers were using the towels in a manner Myers knew would breach the contracts. While the facts the court highlights may lead a reasonable person to conclude that Myers's conduct was proper behavior, this is a question for the factfinder.

In the end, whether an actor's conduct is "improper" for the purpose of tortious interference is a question of "'whether the actor's conduct was fair and reasonable under the circumstances.'" Hayes, 40 S.W.3d at 805 (quoting Restatement (Second) of Torts § 767 cmt. j (1979)). Based on the evidence Georgia-Pacific has presented, reasonable people could disagree as to whether Myers's conduct was improper. "'[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.'" Id. at 805 (quoting Restatement (Second) of Torts § 767 cmt. j (1979)). Accordingly, I would reverse the dismissal of the tortious interference claim and remand the issue to the district court for trial, allowing the factfinder to determine whether Myers's conduct was improper.